The Honorable Brian D. Lynch
Chapter 11
Location of Hearing:  Via Telephone
Date of Hearing:  To be Determined
Time of Hearing: To be Determined
Response Date:  At or Before Hearing

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| In re:<br><br>SHILO INN, IDAHO FALLS, LLC,<br><br>      Debtor and Debtor-in-Possession, | Case No. 20-42489-BDL<br><br>Chapter 11<br> Subchapter V<br><br>Declaration of Larry Chank in Support of First-Day Motions |

I, Larry Chank, hereby declare as follows:

1.      I am over 18 years of age.  I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.      I am currently employed as the CEO of Shilo Management Corporation ("SMC"), which is the manager and operator of the Hotel (as defined below) owned by Shilo Inn, Idaho Falls, LLC (the "Debtor") the debtor and debtor in possession in the above-captioned, chapter 11 bankruptcy case.

3.      I have reviewed and am familiar with and am knowledgeable about the books and records of SMC and the Debtor, which books and records are made in the regular practice of business, kept in the regular course of business, made by a person with knowledge of the events and information related thereto, and made at or near the time of events and information recorded.

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 1

103715353.1 0070625-00002

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

Case 20-42489-BDL    Doc 15    Filed 11/03/20    Ent. 11/03/20 09:49:25    Pg. 1 of 24

1      4.      I was hired as CEO of SMC in February 2019, in which role I have continued to

2  serve to this present day.  I am the authorized agent for the Debtor in its chapter 11 bankruptcy

3  case.

4      5.      I began my hospitality career in 1988 and have hands-on experience in hotel &

5  restaurant operations (15 years) and accounting/finance (49 years).  I am a 1970 graduate of

6  Niagara University, Niagara Falls, New York, with a BBA in accounting and service as a

7  Lieutenant in the Army Artillery.  Prior to Shilo Inns, my position was the CFO/Controller for

8  the Hopi Tribe Economic Development Corporation, and,  in addition to my accounting duties,

9  this position allowed me to advise the Hopi Tribe on matters related to operation of their

10  residential, commercial, hotel, restaurant, travel plaza, and other real estate developments.  I

11  have a Certified Public Accountant license issued in the State of New York, and I am a licensed

12  real estate broker in the State of California.

13      6.      My duties have included the management and oversight of accounting personnel,

14  including Accounts Payable, Accounts Receivable, Payroll, General Ledger, Audit, Treasury,

15  Budgets, Cash Flow, Financial Reporting, Human Resources, and Information Systems.

16      7.      I make this declaration in support of the Debtor's "first day motions" (each a

17  "Motion" and, collectively, the "Motions") listed here as follows:

18

19         a.   Debtor's Emergency Motion for Entry of an Order Authorizing
20             Debtor to: (A) Use Cash Collateral on an Interim Basis Pending a
           Final Hearing; and (B) Setting a Final Hearing (the "Cash
21             Collateral Motion");

22         b.   Debtor's Emergency Motion for Entry of an Order Authorizing the
           Continued Use of Debtor's Cash Management Systems (the "Cash
23             Management Motion");

24         c.   Debtor's Emergency Motion for Authority to (1) Pay Prepetition
           Wages, Commissions and Bonuses; and (2) Honor Accrued
25             Vacation and Leave Benefits in the Ordinary Course of Business
           (the "Wage Motion");

26

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 2

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

103715353.1 0070625-00002

Case 20-42489-BDL   Doc 15   Filed 11/03/20   Ent. 11/03/20 09:49:25   Pg. 2 of 24

d. Debtor's Emergency Motion for Entry of an Order Authorizing Debtor to Provide Adequate Assurance of Future Payment to Utility Companies Pursuant to Section 366(c) of the Bankruptcy Code (the "Utilities Motion"); and

e. Debtor's Emergency Motion for Entry of an Order Authorizing Debtor to Honor Certain Prepetition Obligations to Customers (the "Customer Loyalty Program Motion").

## I.    GENERAL INFORMATION

### A.    General Information

8.    The Debtor commenced its chapter 11 bankruptcy case by filing a voluntary petition under chapter 11 of title 11, sections 101 *et seq.* of the United States Code, (the "Bankruptcy Code") on November 2, 2020 (the "Petition Date").

9.    The Debtor continues to operate their businesses and manage its financial affairs as a debtor in possession.  No committee of unsecured creditors has been formed.

### B.    The Hotel

10.    Mark S. Hemstreet has been the proud founder and owner and of the Shilo Inn Suites Hotel chain since 1974.  Today, there are fourteen (14) company-owned Shilo Inn hotels across the western states, including one  Shilo hotel in Killeen, Texas.

11.    The Debtor owns a hotel ("Hotel"), as described in greater detail below.

12.    The Hotel is collateral for a certain promissory note (the "Loan") originally made in November 2015 and now held by Deutsche Bank Trust Company Americas, as Trustee, on behalf of the registered Holders of Citigroup Commercial Mortgage Trust 2017-P7, Commercial Mortgage Pass-Through Certificates, Series 2017-P7 (the "Lender") and serviced by Rialto Capital Advisors, LLC ("Rialto").

13.    The Debtor operates a 162-all suites, 4-story, full-service river front hotel in Idaho Falls, Idaho (the "Hotel"), on fee title land, operated pursuant to a franchise agreement

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 3

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

103715353.1 0070625-00002

with Shilo Franchise International, LLC ("SFI") and managed and operated by Shilo Management Corporation ("SMC"). The full service river-front hotel property has an indoor pool, spa, steam and sauna room, fitness and business center, and large convention center/meeting room facilities as well as a restaurant and lounge that is leased out to an independent third-party tenant lessee. The Hotel has approximately 11 employees, which has been reduced due to the unprecedented COVID-19 pandemic. Based on the appraisal opinion of Mark Hemstreet, the fair market value of the Hotel is at least $16,000,000.

14. As discussed in greater detail below, the total secured debt owing to the Lender is approximately $4,954,532.88 (plus Lender's asserted, alleged default interest, penalties, fees, and costs, which the Debtor disputes), which is secured by the Hotel. As a result, the Debtor submits that its estate benefits by substantial equity cushions, which will allow the Debtor to propose a successful plan of reorganization and pay 100% of the allowed claims of all creditors.

15. The Debtor maintains the Hotel in first-class, excellent condition and in compliance with Shilo Inn franchise standards. Unfortunately, in 2020 the Hotel experienced a sudden and sharp decline in hotel revenues due to the Covid-19 global pandemic and unprecedented global recession.

**C.      The Hotel Secured by Loan with the Lender**

16. On or about November 2, 2015, the Debtor entered into a loan agreement with Natixis Real Estate Capital, LLC ("Natixis"). On information and belief, Natixis collateralized the Loan into commercial mortgage backed securities and sold it as investments in the market. The Loan was being serviced by Wells Fargo as the master servicer prior to being moved to special servicing with Rialto in or about June, 2019. Mark S. Hemstreet, founder of Shilo Inns, is a personal guarantor on the Loan.

17. The Debtor thereafter made timely payments on the Loan. Despite what might appear to be a better economy on Wall Street with record Dow Jones stock averages, the general American economy continued to be a struggle for America's working class, which continued to

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 4

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

103715353.1 0070625-00002

Case 20-42489-BDL      Doc 15      Filed 11/03/20      Ent. 11/03/20 09:49:25      Pg. 4 of 24

have reverberations in the markets serving America's working class families. Shilo Inn has a long and proud 46-year-plus history of providing high quality resort, hotel, and vacation services to American families in the Pacific Northwest, and several western states, including Washington, Oregon, Idaho, Montana, Arizona, Nevada, and Texas. Shilo Inn has been a strong supporter and charitable donor to the service men and women of the United States Armed Forces, and Shilo is proud of its commitment to America's men and women in uniform and America's working class. As America's working class continued to struggle through this economy, the Debtor nonetheless made timely debt service payments to the Lender for three years until the unfortunate conduct of Wells Fargo in late 2018 as described below.

18.     The Debtor made timely payments on the Loan until an alleged default arose with respect to the November, 2018 payment simply as a result of a miscommunication between the Debtor and Wells Fargo that occurred during a transition in the CFO position for Shilo Management Corporation. As the operation of the Hotel is seasonal, the Loan contains a seasonality reserve wherein during busier times of the year, the Debtor was required to pay extra amounts into the seasonality reserve, which funds would be later used to assist in making the monthly loan payments during the slower winter months. In addition to the seasonality reserve, there are other reserves that Debtor was required to pay into on a monthly basis for tax and insurance, and FF&E expenditures. November is a slower month for purposes of revenue of the Hotel, and pursuant to the seasonality reserve, there is to be disbursed to the Debtor the amount of $30,000 before the monthly payment due date to assist the Debtor in making the November monthly payment each year (which would include the principal and interest amount plus required reserve amounts). On or about October 30, 2018, Wells Fargo disbursed the $30,000 to the Debtor. However, as a result of the staff changes noted above, unfortunately, the fact that Wells Fargo sent the $30,000 payment went undetected, thereby causing an internal delay in processing amounts to pay the November, 2018 payment as the Debtor was waiting for the amount to be disbursed from Wells Fargo. Later in November, 2018, Wells Fargo informed Debtor that the

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 5

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone 206.624.0900*

103715353.1 0070625-00002

Case 20-42489-BDL     Doc 15     Filed 11/03/20     Ent. 11/03/20 09:49:25     Pg. 5 of 24

November payment was in default and it was instituting cash management as a result of payment default. The Debtor immediately paid the amount of $23,052.53 which was the difference between the full monthly payment amount owed for November, 2018 of $53,052.52 and the $30,000 which Debtor at that time still believed had not yet been disbursed by Wells Fargo, and would simply be credited to pay the November, 2018 payment in full to resolve the matter. It was not until receiving a default letter from counsel for Wells Fargo on or about December 5, 2018 that Debtor learned that Wells Fargo was claiming that it had made the $30,000 payment. This was despite Debtor informing Wells Fargo several times, including, when it made the $23,052.53 payment, that it was claiming never to have received the $30,000 payment. It was not until several days later, on or about December 5, 2018, that Debtor was given proof that the $30,000 payment had been made, and Debtor immediately apologized for the oversight. At that time, Wells Fargo agreed to withdraw the remaining amount owed on the November 2018 payment from another reserve to pay the November payment in full thereby curing the November 2018 payment default. As the December, 2018 payment was then due, Debtor requested that the December seasonality payment of $50,000 be made to Debtor to help pay the December 2018 monthly payment or simply credit that amount and Debtor would pay the difference (which difference the Debtor did pay on December 5, 2018 as a show of good faith and out of an abundance of caution). Unfortunately, Wells Fargo insisted on instituting cash management despite the November monthly payments having been fully paid, and despite having sufficient funds in the seasonality reserve to make the December, 2018 payment along with the amount that Debtor wired on December 5, 2018. It was at this time the Debtor further found out that the seasonality reserve and other reserves for the Loan had been overfunded by Wells Fargo; meaning Wells Fargo had been invoicing and taking more funds from Debtor each month than it was supposed to under the loan documents. Even after acknowledging its mistakes with regards to its overfunding and lack of administration of the reserves, Wells Fargo refused to

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 6

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone 206.624.0900*

103715353.1 0070625-00002

Case 20-42489-BDL    Doc 15    Filed 11/03/20    Ent. 11/03/20 09:49:25    Pg. 6 of 24

1  correct the reserve issues and continued to institute cash management as a result of the alleged

2  payment defaults for November and December, 2018.

3       19.    Once in the cash management vicious cycle, it is hard for any a debtor to recover.

4  In the approximate 24 months leading up to the bankruptcy filings, first Wells Fargo as the

5  master servicer and then Rialto as the special servicer (after the Loan was transferred to special

6  servicing in approximately June, 2019) would seize most of the Debtor's operating cash accounts

7  under a lockbox cash management provision, making it very challenging for SMC and SFI to

8  operate the hotels. Rialto collected all of the operating cash that Shilo created and insisted that

9  the Debtor's affiliates Shilo Management Corporation ("SMC"), Shilo Franchise International,

10  LLC ("SFI") and Mr. Hemstreet personally pay for all of the expenses, including, but not limited

11  to, for example, labor, payroll, utilities, insurance, vendors, supplies, and taxes at the Hotels

12  rather than use the Debtor's own generated operating cash and reserves to pay its own expenses.

13  The Debtor was required to submit monthly operating expense ("Opex") draw requests at the end

14  of each month and then have to wait at least another  45 days to ever receive reimbursement,

15  resulting in SMC, SFI and Mr. Hemstreet having to advance and fund millions of dollars causing

16  more financial hardship on the Debtor, SMC, SFI and Mr. Hemstreet.

17       20.    Of course, more recently has been the horrible onset of the COVID-19 pandemic.

18  The American economy in general and the hotel industry in particular have been decimated as a

19  result of the pandemic and the applicable state and local stay at home orders.  Specifically, the

20  pandemic and applicable stay at home orders caused a sudden and dramatic loss of revenues and

21  occupancy at the Hotel just when the Hotel would normally experience increasing revenues

22  coming out of winter and going into spring and summer break busier seasons.  As a result of the

23  COVID-19 pandemic and the immediate loss of revenue and occupancy as a result of the stay at

24  home orders, the Debtor has suffered further severe economic hardship in addition to the

25  horrendous cash management situation.  The Debtor is not unique among hotel owners and

26  operators defaulting on loans and facing foreclosure as a result of the COVID-19 pandemic.  A

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 7

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

103715353.1 0070625-00002

Case 20-42489-BDL    Doc 15    Filed 11/03/20    Ent. 11/03/20 09:49:25    Pg. 7 of 24

recent survey by the American Hotel and Lodging Association estimated that half of hotel owners in the country are in danger of foreclosure as a result of the pandemic. It is incumbent upon hospitality lenders to work with their borrowers during these unfortunate times.

21.    Rialto scheduled a non-judicial foreclosure sale of the Hotel, which was continued and rescheduled from time to time, and is currently scheduled for November 3, 2020.

22.    The Shilo organization paid to Rialto additional and substantial sums to postpone the foreclosures sales while the parties attempted to reach an out-of-court agreement on restructuring the debt.  Additionally, SFI and SMC have forgone and not received franchise and management fees since at least September 2018 as part of Shilo's good faith effort to accomplish a successful restructuring.   When negotiations broke down, the Debtor determined in its reasonable business judgment that it would be best to file for chapter 11 bankruptcy protection for the benefit of all creditors, to save the jobs of the 11 employees who work at the Hotel, and to save the equity in the Hotel through a reorganization of its financial affairs in bankruptcy court.

## II.    CASH COLLATERAL

### A.    The Debtor's Primary Asset and Secured Debt

23.    The Debtor's primary asset is the Shilo Inn, Idaho Falls LLC Hotel.  Based on a draft appraisal report of an MAI certified appraisal in 2016 ordered by the Lender, the Hotel had a fair market value of approximately $9,100,000, and Mark Hemstreet opines that the value is now at least $16,000,000.

24.    The Lender's secured claim is approximately $4,954,532.88 (plus Lender's asserted, alleged default interest, penalties, fees, and costs, which the Debtor disputes), rendering an equity cushion of $11,045,467.12, which calculates to an equity cushion percentage of 223%.

### B.    Need for Use of Cash Collateral

25.    The Debtor seeks Court authority to use cash collateral in order to pay the expenses of maintaining and operating its business, as set forth in the Budget, a copy of which is

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 8

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

103715353.1 0070625-00002

Case 20-42489-BDL    Doc 15    Filed 11/03/20    Ent. 11/03/20 09:49:25    Pg. 8 of 24

attached as **Exhibit 1** to the Declaration of Larry Chank in Support of First-Day Motions (the "Master Declaration"), through January 2021. The Budget reflects the Debtor's ordinary and necessary operating expenses that must be paid for November and post-petition to preserve its business. While the Budget represents the Debtor's best estimate of such expenses, the needs of the business may fluctuate. Thus, the Debtor seeks authority to deviate from the total expenses contained in the Budget by no more than 15% on a line-item basis and/or no more than 10% on a cumulative basis without the need for further Court order. The Debtor also most importantly requests that Rialto immediately provide a full bank deposit accounting of all the applicable Shilo Inn, Idaho Falls, LLC prepetition lock box, cash management and reserve accounts including transaction application of funds reporting and pay over to the Debtor all of the operating revenues generated for the full month of October including November 1, 2020, so that Debtor has the needed revenues to pay normal operating expenses in the normal course.

26. The Debtor believes that the current valuation of the Hotel on a going-concern basis and the continued operation of the Hotel provide adequate protection to the Lender and the other secured creditors. Hotel operations are a somewhat seasonal business, and although there is a dip in cash for the Debtor in this 13-week period, that is because the Hotel is entering its slowest season, and the cash balance will rise in the Spring and Summer.

27. If the Debtor is not permitted to use cash collateral to maintain and operate the Hotel, it is a virtual certainty that the estate would regrettably have to be liquidated. Specifically, without use of cash collateral and the ability to operate, existing guests will not receive services and will depart, canceling existing charges. Moreover, without use of cash collateral, future reservations will also be cancelled. If the Debtor is not allowed to use cash collateral for even a limited period of time, the public perception associated with the foregoing will certainly hurt, if not eviscerate, the Debtor's business, thereby reducing the value of the estates and potential recovery to creditors.

**G.    Compliance with Rule 4001(c) of the Federal Rules of Bankruptcy Procedure**

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

28. Pursuant to Rule 4001(c)(1)(B) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), the Debtor submits that the relief requested by the Debtor pertaining to the use of cash collateral does not contain any of the following provisions, except as otherwise indicated below:

| Provision | |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the Debtor of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | No |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the Debtor is authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that prime any secured lien | No |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 10

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

103715353.1 0070625-00002

| Provision | |
|---|---|
| Waivers, effective on default or expiration, of the Debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |
| Findings of fact on matters extraneous to the approval process. | No |

### III.    CASH MANAGEMENT

29.     The Hotel is just one of many hotels under the SFI brand.  Each of these hotels, including the Hotel, has its own separate bank account for receipts from operating activities (the "Depository Account(s)").  The Debtor will close the Depository Account and open a post-petition debtor-in-possession account ("DIP Accounts") to use in place of the Depository Account.    Thereafter, the Debtor requests permission to continue using its existing cash management system, wherein funds from the bank account is transferred to a master accounts payable bank account (the "Master A/P Account") held by Shilo Management Corporation ("SMC") to reimburse for expenses paid by SMC on behalf of the Hotel.  All expenses are paid by checks written from the Master A/P Account.  This results in cost savings and economies of scale by allowing all expenses and accounting to run through one account rather than several.

30.     Meticulous records of the bank accounts ensure that all funds are accounted for.  In the ordinary course of business, SMC creates separate monthly reports for each of the separate hotel entities, including the Debtor, which it will continue to do throughout the bankruptcy cases in connection with reports to the United States Trustee.  SMC logs the individual transfers into the account as they are made, and the accounting system automatically registers checks written out of the account.  SMC produces a statement for the Debtor to show all monies in and out.

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 11

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

103715353.1 0070625-00002

Case 20-42489-BDL    Doc 15    Filed 11/03/20    Ent. 11/03/20 09:49:25    Pg. 11 of 24

31.     Pursuant to the Motion the Debtor will open a debtor-in-possession bank account, but thereafter, the Debtor seeks Court authority to maintain its prepetition cash management systems.  Specifically, the Debtor seeks to collect income through the Debtor's debtor-in-possession bank account, then transfer the cash to the Master Account, from which all expenses for the Debtor will be paid.  Importantly, Debtor will only transfer the exact amount necessary for the Master Account to cut checks for the Debtor's expenses.  All surplus income above what is needed for these expenses will remain in Debtor's Depository Account. Although the Debtor believes that there is no danger in the commingling and loss of estate funds by utilizing the Master A/P Account system, keeping all surplus income in the Debtor's account will serve as yet an extra safeguard to ensure that estate funds remain within the applicable estate and under the auspices of the Court and the Office of the United States Trustee.

## IV.     PREPETITION WAGES

32.     In the operation of the Hotel, the Debtor employs approximately 11 employees on the premises.  Each payroll covers a two-week period and is paid on the 17th day (Wednesday) after the end of each pay period.  The prepetition portion of the Debtor's unpaid payroll period is shown on **Exhibit 2** to the Master Declaration, including the dates covered, when Shilo does payroll, when Shilo cuts checks, initiates direct deposits, and funds payroll. Collectively, this period is referred to as the "Prepetition Period" and the wages as the "Prepetition Wages." The Debtor submits that its hotel managers are not insiders because they do not have any control over the Debtor's financial affairs, budgeting, or macro-decisions, which are all made by the corporate office at SMC (the SMC corporate employees are paid by SMC, not the Debtor, and are not part of the Wage Motion).  The amounts on **Exhibit 2** represent the total gross amount of prepetition payroll, including workers compensation contributions, medical benefit contributions, federal and state withholding taxes, payroll taxes, and service fees to SMC.  None of the employees to be paid Prepetition Wages are insiders.  A redacted list of the employees and the amounts of the Prepetition Wages are shown on **Exhibit**

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 12

103715353.1 0070625-00002

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

2 to the Master Declaration.  The names of the employees have been redacted to protect their privacy, but an un-redacted version will be submitted to the U.S. Trustee, the Court, and Rialto, if requested.

33.   The Debtor makes payments to the employees and all vendors through its cash management system, as described in more detail in a cash management motion filed concurrently with this Master Statement.  Pursuant to this cash management system, the Debtor transfers the exact amount of funds necessary to make payroll from its account to a master account payable bank account (the "Master Payroll Account") held by SMC, who then writes the employee checks from the Master Payroll Account.  This results in cost savings and economies of scale by allowing all expenses and accounting to run through one account rather than several.

34.   The source of funds to be used to honor the wages, salaries, commissions and bonuses for the Prepetition Period will be the Debtor's revenue, which may constitute the cash collateral of the Lender and a number of other secured creditors.  The Debtor's request to use cash collateral is included in a separate motion filed concurrently herewith.

35.   By way of the Wage Motion, the Debtor seeks authority to transfer the exact amount of funds necessary to SMC for the express purpose of paying non-insider, Prepetition Wages, within the limits of $13,650 per employee.

36.   All of the employees to which the Debtor seeks to pay wages, salaries, commissions, and bonuses for the Prepetition Period are still employed by the Debtor.  The Debtor submits that approval to honor the employees' wages, salaries, commissions, and bonuses for the Prepetition Period, including all federal and state withholding taxes, payroll taxes, employer matching 401(k) contributions, and payroll service fees, will not render any estate administratively insolvent.

37.   The Debtor's employees are integral to the Debtor's continued operation and the generation of revenue, while preserving the value of all of the estates.  In short, the Debtor

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 13

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

103715353.1 0070625-00002

Case 20-42489-BDL    Doc 15    Filed 11/03/20    Ent. 11/03/20 09:49:25    Pg. 13 of 24

cannot continue to operate and reorganize without the employees.  If the Debtor does not continue to pay its employees their ordinary and earned wages, salaries, commissions, and bonuses, the employees will likely quit.  Without employees, the Debtor's operations and the value of its business will be severely impaired, if not eviscerated altogether.

## V.   UTILITIES

38.    To operate the Hotel, the Debtor receives water, gas, electricity, sewer, garbage telephone, TV, movie/cinema, internet, and similar utility services from a number of utility companies (each a "Utility Company," and collectively, the "Utility Companies").  Given the importance of the services provided by the Utility Companies to the Debtor's business, it is crucial that the means of providing adequate assurance to the Utility Companies which provide utility services to the Debtor be determined so that there is no interruption in the services provided.

39.    Prior to the commencement of the Debtor's bankruptcy cases, the Utility Companies listed in **Exhibit 3** to the Master declaration of Larry Chank provided utility services to the Debtor.  The Debtor intends to provide adequate "assurance of payment" by providing each of the Utility Companies listed in **Exhibit 3** with a cash deposit, as authorized by Section 366(c)(1)(A)(i) of the Bankruptcy Code, in the amounts set forth in **Exhibit 3**, provided that the Debtor will continue to utilize such services.  The proposed deposit amounts were determined based on an average of the three (3) monthly ledgers reflecting expenses the Debtor incurred for the Utility Companies.  To the extent that a deposit is already in place with a particular Utility, such amount was deducted from the proposed deposit sought herein.  The source of funds to be used to pay the cash deposits to the Utility Companies will be the Debtor's post-petition revenues and cash on hand.

## VI.   CUSTOMER LOYALTY PROGRAM OBLIGATIONS

40.    The Debtor's hotel is just a few of 14 affiliated hotels under the SFI brand.  The Star Program allows customers of Shilo Inns to earn 1 point per dollar spent on room rates per

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 14

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

103715353.1 0070625-00002

Case 20-42489-BDL    Doc 15    Filed 11/03/20    Ent. 11/03/20 09:49:25    Pg. 14 of 24

day, excluding tax and other expenses. For each 900 points gained, the customer can earn a free night at a Shilo Inn hotel. Accordingly, Shilo customers can also earn a variety of certificates with points ranging from 250-900, which is clearly stated on the Shilo Inn website under Star Rewards along with its terms and conditions. The Debtor submits that the Star Program provides benefits to the Debtor because it encourages customers to be loyal in choosing the hotel over the many other hotel choices that they have in each region. Without the Star Program, it is almost certain that the Debtor will lose business and future business from customers who would otherwise not have this incentive to be loyal in choosing Shilo hotels.

41. The Debtor submits that the discretion to honor the Star Program is essential to the Debtor's maintenance of positive customer relations, as a failure to honor the existing Star Program is certain to detrimentally affect customer goodwill and impair the Debtor's ability to generate repeat business from the Debtor's customers. If the Debtor is not authorized to honor the Star Program in its discretion, the Debtor's ability to continue to generate business, successfully reorganize and/or maximize value for creditors could be seriously jeopardized, particularly where the underlying transaction involves long-standing, crucial customers.

42. The Debtor engages in the Star Program in the ordinary course of its business. The Debtor's most important clients are familiar with the Star Program and expect the benefits they receive from them. The success of the Debtor's business and the ability of the Debtor to successfully reorganize and/or to maximize value for creditors is completely dependent upon the loyalty, confidence, and continued patronage of its clients. Any delay in honoring the Star Program obligations likely will create immediate and irreparable customer dissatisfaction and frustration, causing clients to offer their business to the Debtor's competitors.

43. At a time when customer loyalty and patronage is critical to the Debtor's reorganization efforts, the Debtor's submit that it is entirely necessary, and appropriate, for the Court to issue an order allowing the Debtor to continue to honor the Star Program in these circumstances.

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 15

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone 206.624.0900*

103715353.1 0070625-00002

Case 20-42489-BDL    Doc 15    Filed 11/03/20    Ent. 11/03/20 09:49:25    Pg. 15 of 24

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on this 2nd day of November 2020, at Portland, Oregon.

LARRY CHANK

DATED: November 2, 2020.

LEVENE, NEALE, BENDER,
YOO & BRILL L.L.P.

/s/ David B. Golubchik

David B. Golubchik (pro hac vice pending)
John-Patrick M. Fritz (pro hac vice pending)

Proposed Attorneys for Debtor and
Debtor-in-Possession

STOEL RIVES LLP

/s/ Bryan T. Glover

Bryan T. Glover, WSBA No. 51045

Proposed Attorneys for Debtor and
Debtor-in-Possession

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 16

103715353.1 0070625-00002

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone 206.624.0900*

Case 20-42489-BDL    Doc 15    Filed 11/03/20    Ent. 11/03/20 09:49:25    Pg. 16 of 24

**Exhibit 1**

# Shilo Inn Idaho Falls, LLC

## PROFORMA OPERATING STATEMENT PREPARED ON CASH FLOW BASIS

### October 30, 2020 to January 28, 2021

| | First Month by Week | | | | Proforma Operating Statement | | | Three Month Totals |
|---|---|---|---|---|---|---|---|---|
| | Week 1 10/30-11/5 | Week 2 11/6-12 | Week 3 11/13-19 | Week 4 11/20-26 | Weeks 1-4 Oct 30 - Nov 26 | Weeks 5-9 Nov 27 - Dec 31 | Weeks 10-13 Jan 1 - Jan 28 | |
| AVAILABLE ROOMS | 1,134 | 1,134 | 1,134 | 1,134 | 4,536 | 5,670 | 4,536 | 14,742 |
| ROOMS SOLD | 295 | 305 | 312 | 310 | 1,222 | 1,561 | 1,244 | 4,027 |
| COMP ROOM NIGHTS | 4 | 4 | 4 | 4 | 16 | 20 | 16 | 52 |
| TOTAL ROOMS OCCUPIED | 299 | 309 | 316 | 314 | 1,238 | 1,581 | 1,260 | 4,079 |
| AVERAGE DAILY RATE | $70.00 | $72.00 | $74.00 | $76.00 | $73.04 | $76.18 | $79.69 | $76.31 |
| AVERAGE DAILY RATE (incl comps) | $69.06 | $71.07 | $73.06 | $75.03 | $72.10 | $75.22 | $78.68 | $75.34 |
| OCCUPANCY % (rooms sold) | 26.0% | 26.9% | 27.5% | 27.3% | 26.9% | 27.5% | 27.4% | 27.3% |
| OCCUPANCY % (incl comps) | 26.4% | 27.2% | 27.9% | 27.7% | 27.3% | 27.9% | 27.8% | 27.7% |
| REVENUE PER AVAILABLE ROOM | $18.21 | $19.37 | $20.36 | $20.78 | $19.68 | $20.97 | $21.85 | $20.85 |
| **DEPARTMENTAL REVENUE** | | | | | | | | |
| ROOMS | 20,650 | 21,960 | 23,088 | 23,560 | 89,258 | 118,922 | 99,132 | 307,312 |
| MISCELLANEOUS | 1,805 | 1,919 | 2,018 | 2,059 | 7,800 | 10,393 | 8,663 | 26,856 |
| OCCUPANCY TAX COLLECTIONS [2] | 2,478 | 2,635 | 2,771 | 2,827 | 10,711 | 14,271 | 11,896 | 36,877 |
| GROSS REVENUE and OTHER CASH RECEIPTS | 24,933 | 26,514 | 27,876 | 28,446 | 107,769 | 143,586 | 119,691 | 371,045 |
| **COST OF GOODS / SERVICES SOLD** | | | | | | | | |
| ROOMS | 6,294 | 6,693 | 6,637 | 6,773 | 26,397 | 30,370 | 28,780 | 85,547 |
| MISCELLANEOUS | 632 | 672 | 706 | 721 | 2,730 | 3,637 | 3,032 | 9,400 |
| TOTAL COST OF GOODS / SERVICES SOLD | 6,926 | 7,365 | 7,343 | 7,494 | 29,127 | 34,007 | 31,812 | 94,947 |
| **DEPARTMENTAL PROFIT and OTHER CASH RECEIPTS** | | | | | | | | |
| ROOMS | 14,356 | 15,267 | 16,451 | 16,787 | 62,861 | 88,552 | 70,352 | 221,765 |
| MISCELLANEOUS | 1,173 | 1,247 | 1,311 | 1,338 | 5,070 | 6,755 | 5,631 | 17,456 |
| GROSS PROFIT | 18,007 | 19,150 | 20,533 | 20,952 | 78,642 | 109,578 | 87,878 | 276,099 |
| **GEN & ADMIN EXPENSE AND OTHER CASH OUTFLOWS** | | | | | | | | |
| ADVERTISING & PROMOTION | 3,847 | 3,933 | 4,006 | 4,037 | 15,823 | 8,759 | 6,468 | 31,050 |
| PROPERTY MAINTENANCE | 2,546 | 2,660 | 2,758 | 2,800 | 10,765 | 12,931 | 10,779 | 34,476 |
| GENERAL & ADMINISTRATIVE | 1,796 | 1,910 | 2,008 | 2,050 | 7,765 | 14,225 | 11,857 | 33,847 |
| UTILITIES (Week 2 figure represents est deposits) | | 9,900 | | | 9,900 | 8,600 | 9,500 | 28,000 |
| INSURANCE | | | 7,240 | | 7,240 | 7,240 | 7,240 | 21,720 |
| SECURED PROPERTY TAX (est ) | | | | | | 89,200 | | 89,200 |
| FRANCHISE FEES [3] | 826 | 878 | 924 | 942 | 3,570 | 3,570 | 4,757 | 11,897 |
| SMC MANAGEMENT FEE | 997 | 1,061 | 1,115 | 1,138 | 4,311 | 5,743 | 4,788 | 14,842 |
| OCCUPANCY TAX [2] | | | | 6,860 | 6,860 | 11,604 | 15,460 | 33,924 |
| TOTAL GENERAL & ADMINISTRATIVE EXPENSES AND OTHER CASH OUTFLOWS | 10,013 | 20,342 | 18,052 | 17,827 | 66,234 | 161,872 | 70,849 | 298,955 |
| **NET CASH FLOW FROM OPERATIONS** | 7,994 | (1,193) | 2,481 | 3,126 | 12,408 | (52,294) | 17,029 | (22,857) |
| | 32.1% | -4.5% | 8.9% | 11.0% | 11.5% | -36.4% | 14.2% | -6.2% |
| **Cash Beginning of Period** | 40,000 | 47,994 | 46,801 | 49,282 | 40,000 | 52,408 | 114 | |
| Change in period | 7,994 | (1,193) | 2,481 | 3,126 | 12,408 | (52,294) | 17,029 | |
| Cash End of Period | 47,994 | 46,801 | 49,282 | 52,408 | 52,408 | 114 | 17,143 | |
| Trade Accounts Receivable Beginning of Period [4] | 76,815 | 76,815 | 76,815 | 76,815 | 76,815 | 76,815 | 76,815 | |
| Change in period [5] | - | - | - | - | - | - | - | |
| Trade Accounts Receivable End of Period | 76,815 | 76,815 | 76,815 | 76,815 | 76,815 | 76,815 | 76,815 | |
| Est. Inventory Beginning of Period [4] | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 | |
| Change in period [5] | - | - | - | - | - | - | - | |
| Inventory End of Period | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 | |
| FF&E (Est. FMV) Beginning of Period [4] | 190,000 | 190,000 | 190,000 | 190,000 | 190,000 | 190,000 | 190,000 | |
| Change in period [5] | - | - | - | - | - | - | - | |
| FF&E End of Period | 190,000 | 190,000 | 190,000 | 190,000 | 190,000 | 190,000 | 190,000 | |
| Real Property (FMV) Beginning of Period | 16,000,000 | 16,000,000 | 16,000,000 | 16,000,000 | 16,000,000 | 16,000,000 | 16,000,000 | |
| Change in period [5] | - | - | - | - | - | - | - | |
| Real Property (FMV) End of Period | 16,000,000 | 16,000,000 | 16,000,000 | 16,000,000 | 16,000,000 | 16,000,000 | 16,000,000 | |
| **TOTAL ALL ASSETS - END OF PERIOD** | 16,346,059 | 16,344,866 | 16,347,347 | 16,350,473 | 16,350,473 | 16,298,179 | 16,315,208 | |

Notes:

1) Payroll expense is included in Rooms, A&G, Sales, & Maintenance departments as appropriate

2) Occupancy tax payments are estimated at 13% of revenue and payments are based on the prior month's receipts

3) Franchise fee is 4% of prior month's total revenue

4) Estimated balances as of 10/01/2020

5) Net change is assumed to be zero each period

**Exhibit 2**

**Report** Payroll Register (By Account)
**Filtered By** Pay Dates: Specific Payroll: Bi-Weekly A Week Regular
**Date & Time** 10/30/2020 02:25p
**Generated By**
**Company** SHILO NNS (6013713)

| Employee EIN | Employee Id | Default Location |
|---|---|---|

---

### (Shilo Management Corporation) - #460676 — # Of Statements: 1

Shilo Management Corporation — 460676 Idaho Falls - SS

| Pay Type | Hrs | Rate | Amt | Deductions EE Amt | ER Amt | Taxes | Amt | Net Pay | Amt |
|---|---|---|---|---|---|---|---|---|---|
| Regular | 69.49 | 69.49 | $694.90 | No Deductions | | FIT | $63.25 | Check | $572.49 |
| Vacation | | | | | | FICA | $43.08 | | |
| | | | | | | MEDI | $10.08 | | |
| | | | | | | SIT/ID | $6.00 | | |
| **Totals:** | | 69.49 | $694.90 | | | **Totals:** | $122.41 | | |

### (Shilo Management Corporation) - #461496 — # Of Statements: 1

Shilo Management Corporation — 461496 Idaho Falls - SS

| Pay Type | Hrs | Rate | Amt | Deductions EE Amt | ER Amt | Taxes | Amt | Net Pay | Amt |
|---|---|---|---|---|---|---|---|---|---|
| Overtime | 0.84 | $12.60 | | No Deductions | | FIT | $92.36 | Check | $645.06 |
| Regular | 80.00 | $800.00 | | | | FICA | $50.38 | | |
| | | | | | | MEDI | $11.78 | | |
| | | | | | | SIT/ID | $13.00 | | |
| **Totals:** | 80.84 | | $812.60 | | | **Totals:** | $167.54 | | |

### (Shilo Management Corporation) - #1993 — # Of Statements: 1

Shilo Management Corporation — 1993 Idaho Falls - SS

| Pay Type | Hrs | Rate | Amt | Deductions EE Amt | ER Amt | Taxes | Amt | Net Pay | Amt |
|---|---|---|---|---|---|---|---|---|---|
| Overtime | 7.44 | $167.40 | | No Deductions | | FIT | $119.11 | Check | $1,100.68 |
| Regular | 80.00 | $1,200.00 | | Breakpoint | $99.69 | FICA | $84.78 | | |
| Vacation | | | | | | MEDI | $19.83 | | |
| | | | | | | SIT/ID | $43.00 | | |
| **Totals:** | 87.44 | | $1,367.40 | **Totals:** $266.72 | $99.69 | **Totals:** | $266.72 | | |

### (Shilo Management Corporation) - #571993 — # Of Statements: 1

Shilo Management Corporation — 571993 Idaho Falls - SS

| Pay Type | Hrs | Rate | Amt | Deductions EE Amt | ER Amt | Taxes | Amt | Net Pay | Amt |
|---|---|---|---|---|---|---|---|---|---|
| FFCRA FMLA 10 We | | | | MOO | $17.78 | FIT | $271.31 | Check | $1,561.47 |
| FFCRA Family Lea | | | | | | FICA | $131.15 | | |
| FFCRA Sick Leave | | | | | | MEDI | $30.67 | | |
| Overtime | | | | | | SIT/ID | $103.00 | | |
| Regular | 80.00 | $2,115.38 | | | | | | | |
| Sick | | | | | | | | | |
| **Totals:** | 80.00 | | $2,115.38 | | | **Totals:** | $536.13 | | |

### (Shilo Management Corporation) - #442212 — # Of Statements: 1

Shilo Management Corporation — 442212 Idaho Falls - SS

| Pay Type | Hrs | Rate | Amt | Deductions EE Amt | ER Amt | Taxes | Amt | Net Pay | Amt |
|---|---|---|---|---|---|---|---|---|---|
| Overtime | 14.71 | $220.65 | | No Deductions | | FIT | $37.83 | Check | $698.74 |
| Regular | 80.00 | $800.00 | | | | FICA | $63.28 | | |
| Reimbursement (N | | | | | | MEDI | $14.80 | | |
| | | | | | | SIT/ID | $6.00 | | |
| **Totals:** | 94.71 | | $1,020.65 | | | **Totals:** | $121.91 | | |

### (Shilo Management Corporation) - #217 — # Of Statements: 1

Shilo Management Corporation — 217 Idaho Falls - SS

| Pay Type | Hrs | Rate | Amt | Deductions EE Amt | ER Amt | Taxes | Amt | Net Pay | Amt |
|---|---|---|---|---|---|---|---|---|---|
| Overtime | 4.68 | $70.20 | | No Deductions | | FIT | $79.29 | Check | $707.34 |
| Regular | 80.00 | $800.00 | | | | FICA | $53.95 | | |
| | | | | | | MEDI | $12.62 | | |
| | | | | | | SIT/ID | $17.00 | | |
| **Totals:** | 84.68 | | $870.20 | | | **Totals:** | $162.86 | | |

### (Shilo Management Corporation) - #229 — # Of Statements: 1

Shilo Management Corporation — 229 Idaho Falls - SS

## (Shilo Management Corporation) — Payroll Detail

### Employee 236 — Idaho Falls - SS — Shilo Management Corporation — #236

| Pay Type | Hrs | Rate | Amt |
|---|---|---|---|
| Overtime | 8.39 | | $119.56 |
| Regular | 80.00 | | $760.00 |
| Totals: | 88.39 | | $879.56 |

Deductions: (none listed)

| Taxes | Amt |
|---|---|
| FIT | $80.41 |
| FICA | $54.53 |
| MEDI | $12.75 |
| SIT ID | $18.00 |
| Totals: | $165.69 |

Net Pay — Check — $713.87
# Of Statements: 1

---

### Employee 237 — Idaho Falls - SS — Shilo Management Corporation — #237

| Pay Type | Hrs | Rate | Amt |
|---|---|---|---|
| Overtime | 0.17 | | $2.42 |
| Regular | 64.24 | | $610.28 |
| Totals: | 64.41 | | $612.70 |

Deductions: No Deductions

| Taxes | Amt |
|---|---|
| FIT | $13.58 |
| FICA | $37.99 |
| MEDI | $8.88 |
| SIT ID | |
| Oregon Transit | |
| WC-OR | |
| Totals: | $60.45 |

Net Pay — Check — $552.25
# Of Statements: 1

---

### Employee 295 — Idaho Falls - SS — Shilo Management Corporation — #295

| Pay Type | Hrs | Rate | Amt |
|---|---|---|---|
| Regular | 78.59 | | $903.79 |
| Totals: | 78.59 | | $903.79 |

Deductions: No Deductions

| Taxes | Amt |
|---|---|
| FIT | $83.32 |
| FICA | $56.03 |
| MEDI | $13.10 |
| SIT ID | $19.00 |
| Totals: | $171.45 |

Net Pay — Check — $732.34
# Of Statements: 1

---

### Employee 299 — Idaho Falls - SS — Shilo Management Corporation — #299

| Pay Type | Hrs | Rate | Amt |
|---|---|---|---|
| Regular | 66.56 | | $632.32 |

Deductions: No Deductions

| Taxes | Amt |
|---|---|
| FIT | $50.74 |
| FICA | $39.21 |
| MEDI | $9.17 |
| SIT ID | $4.00 |
| Totals: | $103.12 |

Net Pay — Check — $529.20
# Of Statements: 1

---

| Pay Type | Hrs | Rate | Amt |
|---|---|---|---|
| Regular | 35.28 | | $335.16 |

Deductions: No Deductions

| Taxes | Amt |
|---|---|
| FICA | $20.78 |
| MEDI | $4.86 |
| Totals: | $25.64 |

Net Pay — Check — $309.52

---

## Total

# of EE's - 11 / # of Statements - 11

| Pay Type | Hrs | Rate | Amt |
|---|---|---|---|
| FFCRA FMLA 10 We | | | |
| FFCRA Family Lea | | | |
| FFCRA Sick Leave | | | |
| Overtime | 36.23 | | $592.83 |
| Regular | 794.16 | | $9,651.83 |
| Reimbursement (N | | | |
| Sick | | | |
| Vacation | | | |
| Totals: | 830.39 | | $10,244.66 |

| Deductions | EE Amt | ER Amt |
|---|---|---|
| MOO | $17.78 | |
| Breakpoint | | 99.96 |

| Taxes | Amt |
|---|---|
| FIT | $691.22 |
| FICA | $635.16 |
| MEDI | $148.54 |
| SIT ID | $229.00 |
| SIT OR | |
| Oregon Transit | |
| WC-OR | |
| Totals: | $1,903.92 |
| FUTA | $25.40 |
| FICA | $635.16 |
| MEDI | $148.54 |
| Idaho Workforce | |

Net Pay — Check — $8,322.96

SUTA ID
Trimet Excise T $52.17
WC:OR

ER Totals: $861.27

All Totals: $2,765.19

**Exhibit 3**

Shilo Inn, Idaho Falls, LLC
Utility Providers
As of October 30, 2020
SS

| Utility Provider Name | Type of Utility | Account No. | Location Served | Security Deposit? | Previous Bill (Month 1) | Previous Bill (Month 2) | Previous Bill (Month 3) | Proposed Cash Deposit | Utility Address | Utility Tel. No. |
|---|---|---|---|---|---|---|---|---|---|---|
| CenturyLink | telephone | 208 523 9958 | Idaho Falls  hotel | unknown | 55.87 | 57.48 | 54.35 | 55.9 | PO Box 2956, Phoenix, AZ 85062-2956 | 800.777.9594 |
| Silver Star Communications | internet | 131677 | Idaho Falls  hotel | unknown | 419.98 | 419.98 | 419.98 | 419.98 | PO Box 226, Freedom, WY 83120-0226 | 307-883-6029 |
| CenturyLink | telephone | 88907353 | Idaho Falls  hotel | unknown | 526.71 | 507.51 | 515.50 | 516.57 | PO Box 52187, Phoenix, AZ 85072-2187 | 800.860.1020 |
| City of Idaho Falls | Electric/Garbage | 2023507 | Idaho Falls  hotel | unknown | 3137.60 | 3374.40 | 3496.00 | 3336.00 | PO Box 50220, Idaho Falls, ID 83405-0220 | 208-612-8280 |
| City of Idaho Falls | Electric | 2023508 | Idaho Falls  hotel | unknown | 288.56 | 270.80 | 276.72 | 278.69 | PO Box 50220, Idaho Falls, ID 83405-0220 | 208-612-8280 |
| City of Idaho Falls | Water/Sewer | 2028205 | Idaho Falls  hotel | unknown | 659.08 | 721.52 | 700.94 | 693.85 | PO Box 50220, Idaho Falls, ID 83405-0220 | 208-612-8280 |
| City of Idaho Falls | Water/Sewer | 2028206 | Idaho Falls  hotel | unknown | 640.15 | 524.51 | 427.49 | 530.72 | PO Box 50220, Idaho Falls, ID 83405-0220 | 208-612-8280 |
| Intermountain Gas Company | gas | 23651230000-7 | Idaho Falls  hotel | unknown | 1116.07 | 1120.18 | 678.81 | 971.69 | PO Box 5600, Bismarck, ND 58506-5600 | 208.377.6840 |
| Intermountain Gas Company | gas | 20368807130-9 | Idaho Falls  hotel | unknown | 904.94 | 516.23 | 299.78 | 573.65 | PO Box 5600, Bismarck, ND 58506-5600 | 208.377.6840 |

1259.94
1549.72

Copy of Copy of Utility Spreadsheet - Idaho Falls 10 30 20 (00000002)